[No. 2096]

## JOHN RYAN, RESPONDENT, *v.* THE MANHATTAN BIG FOUR MINING COMPANY (A CORPORATION), APPELLANT.

[145 Pac. 907]

1. WORDS AND PHRASES—"PUSHER"—"JIGGER BOSS."

In mining parlance a "pusher" or "jigger boss" is one engaged for the purpose of encouraging or hastening the men.

2. MASTER AND SERVANT—SAFETY APPLIANCES—CAGES IN MINES—STATUTORY PROVISIONS.

Rev. Laws, sec. 6799, making it unlawful to sink or work through any vertical mining shaft at a greater depth than 350 feet unless the shaft is provided with an iron-bonneted safety cage to be used in lowering and hoisting employees, was not complied with by having such a cage somewhere about the workings of a mine without using it, though the employees did not demand its use.

3. MASTER AND SERVANT—SAFETY APPLIANCES—CAGES IN MINES—STATUTORY PROVISIONS.

A bucket and crosshead used in a mine for lowering and raising employees did not comply with Rev. Laws, sec. 6799, requiring an iron-bonneted safety cage where a shaft is deeper than 350 feet, in view of section 4222, which provides that the cages in shafts over 350 feet in depth shall be provided with sheet-iron or steel casing not less than one-eighth inch thick, or with a netting composed of wire not less than one-eighth in diameter, and with doors of the same material, provided, that when the cage is used for sinking only it need not be equipped with the required doors, as this completely describes what is termed in section 6799 an "iron-bonneted safety cage."

4. MASTER AND SERVANT—SAFETY APPLIANCES—CAGES IN MINES—STATUTORY PROVISIONS.

That it was customary to work through and sink in vertical mining shafts by means of a crosshead and bucket for raising and lowering employees did not justify a violation of Rev. Laws, sec. 6799, requiring the use of an iron-bonneted safety cage; it not appearing that the apparatus used was generally and customarily regarded as better or safer than that provided by the statute.

5. MASTER AND SERVANT—ACTIONS FOR INJURIES—EVIDENCE.

In an action for injuries to an employee in a mine caused by the failure to provide an iron-bonneted safety cage as required by Rev. Laws, sec. 6799, evidence that the employer was unaware of the existence of such statute was not admissible.

6. MASTER AND SERVANT—LIABILITY FOR INJURIES—ASSUMPTION OF RISK.

An employee in a mine did not assume the risk of injury from an employer's failure to provide an iron-bonneted safety cage for lowering and raising employees as required by statute, though the same equipment was used for that purpose when he applied for and accepted employment as at the time of the accident.

7. MASTER AND SERVANT—LIABILITY FOR INJURIES—PROXIMATE CAUSE.

An employer's noncompliance with Rev. Laws, sec. 6799, requiring the use of iron-bonneted safety cages in mining shafts more than 350 feet deep, did not entitle an injured employee to damages, unless such noncompliance was the proximate cause of his injuries, and unless a compliance therewith would have avoided the accident and prevented the injuries.

8. MASTER AND SERVANT—LIABILITY FOR INJURIES—ASSUMPTION OF RISK—CONTRIBUTORY NEGLIGENCE.

If a mining company's failure to provide an iron-bonneted safety cage for raising and lowering employees as required by statute was found by the jury to be the proximate cause of injuries to an employee thrown from the hoist in use, assumption of risk and contributory negligence were out of the case, except that contributory negligence might be considered in mitigation of damages.

9. APPEAL AND ERROR—REVIEW—QUESTIONS OF FACT.

The jury's finding as to the cause of injuries to an employee in a mine, thrown from the bucket in which he was riding, when supported by substantial evidence, will not be disturbed.

10. MASTER AND SERVANT—LIABILITY FOR INJURIES—PROXIMATE CAUSE.

The failure of a mining company to provide an iron-bonneted safety cage for raising and lowering employees as required by Rev. Laws, sec. 6799, was the proximate cause of injuries to an employee thrown from the bucket on which he was riding, though the swinging of the bucket against the sides of the shaft or its entanglement with a bell cord were intervening agencies, as the culminating catastrophe would not have happened in the absence of either the omission of the safety appliance or the intervening agencies, and hence they operated concurrently.

11. APPEAL AND ERROR—REVIEW—AMOUNT OF DAMAGES.

Where there was a substantial conflict as to the nature and duration of the injuries sued for, and the amount of the verdict was reasonably supported by the evidence, the injured person testified as a witness, the jury had ample opportunity

to observe his manner, conduct, and condition, and he was sub-
jected to a long and careful cross-examination, the verdict will
not be disturbed as excessive.

APPEAL from the Fifth Judicial District Court, Nye
County; *Mark R. Averill,* Judge.

Action by John Ryan against the Manhattan Big Four
Mining Company. From a judgment for plaintiff and
an order denying a new trial, the defendant appeals.
**Affirmed.**

### STATEMENT OF FACTS

[1] John Ryan, the respondent in this case, a miner of
some eight or ten years' experience, entered the employ
of the appellant corporation as a miner in their property
at Manhattan, Nye County, Nevada, on or about the 1st
day of June, 1912. The nature of his employment was
that of sinking a vertical shaft, and in that line of work
he was a coworker with one James Cushing and one John
Pace. Cushing was acting in the capacity of "pusher"
or "jigger boss," a term used in mining parlance to
designate one who is engaged for the purpose of encour-
aging, or hastening, the men. The shaft in which the
respondent, Ryan, was employed had attained a depth of
approximately 500 feet on the 13th day of June, 1912, the
day on which respondent was injured. During all of the
time that the respondent was engaged in the employ of
appellant company the means of lowering and raising the
employees, of whom respondent was one, from the surface
to the bottom of the shaft, was a bucket and crosshead at
the end of a cable, lowered and raised by means of a
gasoline hoist. For the purpose of signaling the hoisting
engineer on the surface, a bell cord extended from the
surface, or gallows frame on the surface, to the bottom of
the shaft. This bell cord was a three-quarter or seven-
eighth inch rope.

On the 13th day of June the respondent and his
coworkers went on shift at the usual hour, and, pursuant
to their duties, drilled and charged a round of holes,
seven in number. For the purpose of setting off the
shots, hot irons were lowered from the blacksmith shop

to "spit" the fuse.   In order to get access to the fourteen lines of fuse running to the respective holes, a signal was given, and the bucket, which had rested on the floor of the shaft, was raised a little off the floor and held there by the engineer, awaiting further signal.   After the fuses were "spit," the respondent, Ryan, and his coworkers, Pace and Cushing, mounted the rim of the bucket in their customary way, and one of them, Cushing, gave the signal to hoist.   After they had ascended a distance of from fifteen to twenty feet, Ryan and Pace were thrown from the bucket.   Pace prevented himself from falling to the bottom of the shaft by grabbing the timbers on the sides of the shaft.   Respondent, Ryan, however, was thrown to the bottom of the shaft, where fourteen lines of ignited fuse, connecting with the seven charged holes, were burning.   He succeeded, however, in climbing to the second set of timbers, and there protected himself from the explosion which followed.   As a result of the fall, the respondent was more or less severely injured, receiving, among other things, a broken collarbone.   After the explosion the bucket was again lowered by Cushing, who had ascended to the 400-foot level, and Ryan and Pace were picked up and taken to the surface.   The respondent, Ryan, received medical and surgical treatment for the injuries sustained.   The testimony of plaintiff himself is to the effect that since sustaining the injuries he has been unable to perform his usual line of vocation, and has been unable to perform work incidental to his usual vocation, by reason of the ill health caused directly and indirectly by the injuries sustained in falling to the bottom of appellant's shaft.

The trial of this case before a jury in the court below resulted in a verdict and judgment for the sum of $2,500 in favor of the respondent.   From the judgment, and from the order denying the motion for a new trial, appeal is taken.

*H. R. Cooke,* for Appellant.

*P. M. Bowler,* for Respondent.

By the Court, McCARRAN, J. (after stating the facts):

[2] The evidence presented by the record in this case as to the manner in which the accident was caused out of which respondent sustained his injuries is conflicting. It was the contention of respondent in the court below, and the case was tried solely upon the theory, that the accident which resulted in the injury of respondent was brought about by reason of the unstapled bell cord, swinging in the shaft, coming in contact with and in some manner becoming entangled with the men, Pace and Ryan, while they were ascending on the rim of the bucket, the contention being that entanglement with the bell cord caused Pace and Ryan to be thrown from the rim of the bucket, the position and theory of the respondent being that the accident was brought about by the wilful negligence of the appellant company in failing to comply with the provisions of section 6799, Revised Laws of Nevada, which is as follows:

"It shall be unlawful for any person or persons, company, or companies, corporation or corporations, to sink or work through any vertical shaft at a greater depth than three hundred and fifty feet, unless the said shaft shall be provided with an iron-bonneted safety cage, to be used in the lowering and hoisting of the employees of such person or persons, company or companies, corporation or corporations. The safety apparatus shall be securely fastened to the cage and shall be of sufficient strength to hold the cage loaded at any depth to which the shaft may be sunk. In any shaft less than three hundred and fifty feet deep where no safety cage is used and where crosshead or crossheads are used, platforms for employees to ride upon in lowering and hoisting said employees shall be placed above said crosshead or crossheads. Any person or persons, company or companies, corporation or corporations or the managing agent of any person or persons, company or companies, corporation or corporations, violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in the sum of five hundred dollars,

or imprisoned in the county jail for a term of six months, or by both such fine and imprisonment."

The evidence in this case discloses that an iron-bonneted safety cage was somewhere about the workings of the mine, but not in use at any time during the period in which the respondent, Ryan, was an employee of the appellant company. It is the contention of appellant that inasmuch as this safety cage was on the premises, although not used for the purpose of lowering and hoisting the employees while so engaged in sinking the shaft, the appellant company had sufficiently complied with the law, nevertheless.

It is unnecessary for us to comment on the absence of evidence in the record as to the condition of this safety cage, which appears to have been on the premises. It may or it may not have been in working order; there is nothing in the record that would explain its condition in this respect. But, aside from this phase of the question, which plays no part in the case, it is our judgment that the contention of appellant with reference to this phase is untenable.

A statute is not susceptible of interpretation such as that which appellant would seek to put upon it. Clearly, by the terms of the statute it is made unlawful to sink or work through any vertical shaft at a greater depth than 350 feet, unless in the lowering and hoisting of employees, in conducting such work or such sinking, the shaft be provided with an iron-bonneted safety cage.

[3] It is unnecessary for us to dwell upon the fact that a bucket and crosshead such as that which was used in the vertical shaft of appellant on the date on which respondent was injured is not such an appliance as that which is contemplated by section 6799.

Section 4222, Revised Laws—being section 25 of an act entitled "An act creating the office of inspector of mines; fixing his duties and powers," etc.—is as follows:

"The cage or cages in all shafts over 350 feet in depth shall be provided with sheet-iron or steel casing, not less than one-eighth inch thick, or with a netting composed of

wire not less than one-eighth inch in diameter and with doors made of the same material as the side casing, either hung on hinges or working in slides. These doors shall extend at least four feet above the bottom of the cage and must be closed when lowering or hoisting men, except timbermen riding on the cage to attend to timbers that are being lowered or hoisted; *provided,* that when such cage is used for sinking only, it need not be equipped with such doors as are hereinbefore provided for. Every cage must have overhead bars of such arrangement as to give every man on the cage an easy and secure handhold."

Reviewing this provision in conjunction with section 6799, a complete description of that which is in the latter section termed "an iron-bonneted safety cage" is given; and in section 4222 special provision is made for the unusual necessities attendant upon the sinking of shafts such as that which was being accomplished on the property of appellant company when this accident occurred. In other words, the statute provides that, when such cage is used for sinking only, it need not be equipped with such doors as are otherwise required. This special provision was undoubtedly enacted by the legislature with a view to meeting the conditions which are ever attendant where the work of sinking is being carried on. The mere having upon the premises such an apparatus as that which is contemplated by section 6799 does not meet the requirements of the law, where the master, in hoisting or lowering employees working through a vertical shaft, makes no use of the appliance; and the mere fact that the employees failed to demand such an appliance to be used in lowering or hoisting them through the shaft, when it had attained a depth greater than 350 feet, does not relieve the master of the force and effect of the statute. (*Peabody-Alwert Coal Co.* v. *Yandell,* 179 Ind. 222, 100 N. E. 758.) This statute is not only a penal statute in its nature, but it is a remedial statute, intended not primarily to subject the violator to fine or imprisonment, but rather intended to safeguard life and limb of

those who, in the pursuit of their vocation, are called upon to go into places where danger is attendant at every moment; and science and practical experience have brought about this legislation, providing the designated appliance as a practical fulfilment of the common-law rule that requires the master to furnish reasonably safe appliance and a reasonably safe place with which and in which for the servant to work. The equipment prescribed being, in the judgment of the legislative body, the best means for affording reasonable safety to the employed, that equipment or its equivalent in safety efficiency is made obligatory on the employer. (*Miles* v. *Central Coal and Coke Co.*, 172 Mo. App. 229, 157 S. W. 867; *Caspar* v. *Lewin*, 82 Kan. 604, 109 Pac. 657, 49 L. R. A. n. s. 526.) This statute was not enacted with its primal object that of punishment for its violation, but the penalty imposed for the violation was rather prescribed as a reminder that the law is a police regulation, enacted for the purpose of minimizing casualties which entail suffering, privation, and death on those who may be the unfortunate victims.

In order that the employer might know and realize the imperative character of the act, criminal procedure was by the legislature made a method by which compliance with the statutory provision should be enforced. The primal object and purpose of the statute, as we have already said, was the safety of those whose vocation took them into such places of employment; it was to prevent the unnecessary sacrifice of human life; and the unnecessary infliction of human suffering upon those who become the victims of accidents such as the one detailed in this record. This being the object of the law, this relief sought to be afforded by the legislation, the contention that the apparatus contemplated by the law was on the premises, and could have been demanded by the employees, in our judgment, falls far short of a compliance with the spirit or the letter of the legislation. (*Miles* v. *Central Coal and Coke Co.*, *supra*.)

As was said in the case of *Cheek* v. *Railway Co.*, 89

Kan. 269, 131 Pac. 625: "Whenever the law requires the employer himself to take a precautionary measure for the safety of his employee, it is not enough that he make provision for the performance of the act. The precautionary act itself must be performed."

[4] Appellant in this case sought, in the court below, to justify the use of the crosshead and bucket by proving that it was customary to work through and sink in vertical shafts by such apparatus; but we deem it sufficient to say, in this respect, that custom, however prevalent, would not justify an employer in an act which disregards the specific provision of a statute. If the means adopted by the master for caring for and protecting the servant in the performance of his duty are generally and customarily regarded as being better or more liable to insure safety than that which is provided by the statute, then a different rule might prevail; but such cannot, we apprehend, be contended for by appellant in this case. (*Cheek* v. *Railway Co., supra; Miles* v. *Central Coal and Coke Co., supra.*)

[5] Appellants sought to prove, in the court below, that they were unaware of the existence of the statute requiring iron-bonneted safety cages to be used in vertical shafts of a greater depth than 350 feet; but, in our judgment, no error could be assigned to the trial court if it refused to admit such evidence. (*Odin Coal Co.* v. *Denman,* 185 Ill. 413, 57 N. E. 192, 76 Am. St. Rep. 45.) It has been held that an inadvertent failure to comply with the provisions of a statute similar to this is no less a defense than is an intentional evasion thereof. (*Island Coal Co.* v. *Swaggerty,* 159 Ind. 664, 62 N. E. 1103; *Princeton Coal Mining Co.* v. *Lawrence,* 176 Ind. 469, 95 N. E. 423; *Diamond Block Coal Co.* v. *Cuthbertson,* 166 Ind. 290, 76 N. E. 1060; *Peabody-Alwert Coal Co.* v. *Yandell, supra.*) It has been held, as a general proposition, that whenever an act is enjoined or prohibited by law, and the violation of the statute is made a misdemeanor, any injury to the person of another, caused by such violation, is the subject of an action, and that the violation of the law is the basis

of the right to recover, and constitutes negligence *per se.* (*Messenger* v. *Pate, et al.*, 42 Iowa, 443.)

In the case of *McRickard* v. *Flint, et al.*, 114 N. Y. 222, 21 N. E. 153, the Court of Appeals of New York had under consideration a case growing out of the violation of a statute of the State of New York which provided that:

"In any store or building in the city of New York in which there shall exist or be placed any hoistway, elevator, or wellhole, the openings thereof, through and upon each floor of said building, shall be provided with and protected by a substantial railing, and such good and sufficient trapdoors with which to close the same as may be directed and approved by the superintendent of buildings, and such trapdoor shall be kept closed at all times except when in actual use by the occupant or occupants of the building having the use and control of the same."

The trial court in that case instructed, in substance, that any one constructing or using an elevator upon his premises is considered as doing so with knowledge of the law in that respect, and, if such person fails to comply with the requirements of the statute, he is *prima facie* guilty of negligence. The court of appeals held that, as an abstract proposition, there was no error in the charge, as it had reference to the failure to perform a statutory duty. Holding to the same general effect is the case of *Siven* v. *Temiskaming Mining Co.*, 25 Ont. Law Rep. 524.

[6] It is the contention of appellant that, inasmuch as the equipment used for lowering and raising employees from the bottom of the shaft was the same when he applied for employment and accepted such employment as it was on the 13th day of June, the date of the accident, that therefore he assumed the risk attendant upon the use of such equipment. This position, in our judgment, cannot be maintained; and in this respect we quote approvingly from the case of *Carterville Coal Co.* v. *Abbott*, 181 Ill. 495, 55 N. E. 131:

"Where an owner, operator, or manager so constructs or equips his mine that he knowingly operates it without conforming to the provisions of this act, he wilfully

disregards its provisions, and wilfully disregards the safety of miners employed therein. Where such owner, operator, or manager wilfully disregards a duty enjoined on him by legislation of this character, and places in danger the life and limbs of those employed therein, he cannot say that, because one enters a mine as a miner with knowledge that the owner has failed to comply with his duty, he is guilty of contributory negligence. Neither can it be said that, by using the means provided by the owner, operator, or manager for entering the shaft, the miner is guilty of contributory negligence. Mere contributory negligence on the part of a miner will not defeat a right of recovery where he is injured by the wilful disregard of the statute, either by an act of omission or commission, on the part of the owner, operator, or manager. To hold that the same principle as to contributory negligence should be applied in case of one who is injured in a mine because the owner, operator, or manager totally disregarded the statute, as in other cases of negligence, is to totally disregard the provisions of the constitution, which are mandatory in requiring the enactment of this character of legislation, and would destroy the effect of the statute, and in no manner regard the duty of protecting the life and safety of miners."

In applying and construing statutes such as this, courts cannot and should not close their eyes to the primary calculated object and purpose of the act itself, namely, minimizing, so far as legislation can minimize, the opportunity for injury to those required to perform service where latent danger is ever present. The statute under consideration in the Carterville-Abbott case, *supra,* was one growing out of a specific constitutional provision of the State of Illinois. While our constitution contains no such provision, the statute in question here is a wholesome police regulation, enacted for a humane object; and the reasoning set forth in the Carterville-Abbott case, *supra,* is none the less applicable.

The Supreme Court of Illinois, in considering this question under a somewhat similar condition, said:

" 'The rule that the servant assumes the ordinary risks

incident to the business presupposes that the master has performed the duties of caution, care, and vigilance, which the law casts upon him. It is these risks alone, which cannot be obviated by the adoption of reasonable measures of precaution by the master, that the servant assumes.' * * * The law is that the servant does not assume risks that are unreasonable or extraordinary, * * * nor risks of the master's own negligence." (*City* v. *Kostka*, 190 Ill. 135, 60 N. E. 72; *Great Western Coal and Coke Co.* v. *Coffman*, 143 Pac. 30; *Great Western Coal and Coke Co.* v. *Cunningham*, 143 Pac. 26.)

The Supreme Court of Illinois, in a number of cases, held consistently that any conscious omission or failure of an employer to comply with a statute which requires of him that he furnish certain reasonable appliances for the protection of life and limb of the employed renders him liable for ensuing injuries. (*Donk Bros. Coal and Coke Co.* v. *Peton*, 192 Ill. 41, 61 N. E. 330: *Carterville Coal Co.* v. *Abbott, supra; Odin Coal Co.* v. *Denman, supra; Donk Bros. Coal Co.* v. *Stroff*, 200 Ill. 483, 66 N. E. 59.)

[7] In determining whether or not the plaintiff, respondent herein, was entitled to damages for the injuries sustained, the failure on the part of the defendant company to provide the safety appliances prescribed by statute, while a vital question to be determined by the jury, was not the principal question. The principal fact to be determined was as to whether or not the noncompliance with the statute on the part of an employer and its failure to afford that protection which the statute intended to be afforded to the employed was responsible for the accident in which the employed was injured. In other words, the mere noncompliance with the statute on the part of the appellant company would not entitle the respondent to damages for injuries sustained unless the noncompliance with the statute furnished the proximate cause of the accident, and unless a compliance with the statute would have avoided the accident and saved the respondent from the injuries.

[8] This was a question of fact to be determined from

all of the evidence presented at the trial of the case. It was one for the jury to determine. If the jury found, as they undoubtedly did find in this case, that, but for the failure on the part of the employer to provide the safety appliance which the statute prescribed should be provided and used, the respondent would not have been thrown to the bottom of the shaft and thereby injured— if the jury found this as a fact—then the elements of assumed risk and contributory negligence were out of the case (*Odin Coal Co.* v. *Denman, supra*), excepting, however, that the defense of contributory negligence might be considered by the jury, under proper instructions for the purpose of mitigating damages. (*Cameron* v. *Pacific G. & G. Co.*, 144 Pac. 446; *Love* v. *Chambers Lumber Co.*, 64 Or. 129, 129 Pac. 492.)

It is the contention of respondent that the bell cord from the collar to the floor of the shaft was not properly stapled, and hung loose and unfastened from the 400-foot level to the point where respondent was working, and that, in ascending the shaft after having "spit" the fuse, respondent and his coworkers became entangled with the bell cord, and due to this, Pace, the coworker of respondent, was thrown off the bucket, and in being thrown off he so engaged respondent as to drag respondent with him, the latter falling to the bottom of the shaft and sustaining the injuries mentioned.

The record discloses a very sharp conflict in the evidence as to what did really happen as respondent and his coworkers ascended the shaft, standing, as they were, on the rim of the bucket. Appellants contend, and there is some evidence in the record which bears out their contention, that in mounting the bucket the men caused it to swing from side to side in the shaft, and, after having signaled the engineer to hoist, the bucket struck the timbers on the sides of the shaft, and respondent and Pace were thereby thrown off.

[9] As to whether or not the contention of respondent in this respect was correct was one of fact for the jury to

determine; and, there being, in our judgment, substantial evidence to support this contention, we would not disturb their findings in this respect.

[10] It might be observed, however, that even though the contention of appellant be correct that respondent was thrown off by reason of the bucket striking the timbers on the sides of the shaft, the jury, in our judgment, would have been warranted in finding that, had a safety cage been provided for conveying respondent and his coworkers to the surface, the impossibility, or at least improbability, of such an accident would be manifest. It is the contention of appellant that the bell rope, and not the absence of a safety cage, was the proximate cause of the accident.

In the case of *Konig* v. *The Nevada-California-Oregon Railway*, 36 Nev. 220, 135 Pac. 155, we said:

"However difficult it may be, in the first instance, to formulate a proper definition of proximate cause, and, in the second instance, to apply such definition to a set of facts, one general rule is applicable to all cases, regardless of the facts that may be presented in any particular case, and that is, where the evidence discloses a succession of events so linked together as to make a natural whole, and all so connected with the first event as to be in legal contemplation the natural result thereof, the latter will be deemed the primary cause or 'proximate cause,' as it is more often termed. There may be concurrent circumstances, and there may be intervening agencies, and one of the intervening agencies may be the acts of the party injured; but if the culminating fact, or the resultant catastrophe, came about by reason of all these agencies working together concurrently, then the first negligent act is, and should properly be, deemed the proximate cause."

If, as is contended for by appellant, the bell rope was the proximate cause of the accident, or if, as might be contended, the swinging of the bucket and its impact against the timbers on the sides of the shaft caused the

accident, in either event it was within the province of the jury to determine as to whether or not either entanglement with the bell cord or contact with the timbers on the sides of the shaft could have occurred if the safety appliance prescribed by the statute were in use; and if the jury determined, as they undoubtedly did determine in this case, that the accident would not have happened had the respondent, Ryan, been ascending in an iron-bonneted safety cage such as that required by the statute, their determination in this respect, being, in our judgment, supported by substantial evidence, will not be disturbed. As we have already stated, it is not sufficient in an action of this kind to establish merely a wilful omission of the statutory duty. It is necessary to establish that the injury complained of resulted from the omission; in other words, that the omission was the proximate cause of the injury. (*Odin Coal Co.* v. *Denman, supra.*) In this instance there may have been intervening agencies, and these may have been the swinging of the bucket, or entanglement with the bell cord, or both. But the culminating catastrophe would not have happened in the absence of either the primary omission of the safety appliance or the intervening agencies; hence they operated concurrently; hence, the primary negligence—the omission of the safety cage—must be deemed to be the proximate cause of the injury of respondent. (*Konig* v. *Nevada-California-Oregon Ry., supra.*)

A number of assignments of error are asserted by the appellant, relative to instructions given by the trial court; but, in view of our consideration of the law applicable to this case, we deem it unnecessary to dwell upon these. Suffice it to say that we find no error in the instructions as given. Many of the instructions offered by the appellant, and refused by the trial court, were not properly applicable to this case, in view of the law governing its various phases.

[11] It is the contention of appellant that the verdict in this case is excessive, and that the jury were actuated by passion and prejudice in finding the amount. The

evidence showed that the plaintiff, respondent herein, had for some years prior to the accident followed mining as a general vocation.    His specific vocation, in most instances, in so far as the record discloses, was that of manual laborer. The evidence, and especially that coming from the plaintiff, tended to establish that, subsequent to the accident in which he sustained the injuries, he was unable to perform work required of miners, such as he had been accustomed to perform prior to the accident.    There is nothing in the record from which we could even assume that the jury acted other than with cool, calculating impartiality.    The respondent was a witness at the trial in his own behalf.    The jury had ample opportunity to observe his manner, conduct, and condition.    He was subjected to a long and careful cross-examination by the skilled attorney for appellant.    If his testimony brought home to the minds of the jury a belief that his injuries, even though they might not be permanent, were at least debilitating, painful, and long-continued, then it was for them, the jury, acting under proper instructions, to assess the damages.    On this particular phase, the record discloses a most substantial conflict as to the nature and duration of the injuries sustained by respondent; but it is our judgment that the verdict is reasonably supported by the evidence, and it will therefore not be disturbed. (*Muskogee Electric Traction Co.* v. *Mueller*, 39 Okl. 63, 134 Pac. 51; *Nilson* v. *Kalispell*, 47 Mont. 416, 132 Pac. 1133; *Pasarel* v. *Anderson*, 74 Wash. 312, 133 Pac. 441; *Bateman* v. *Middlesex*, 27 Ont. Law Rep. 122; *Railroad Co.* v. *Osborne*, 149 S. W. 954; *Railroad Co.* v. *Limberg*, 152 S. W. 1180.)

It follows from the foregoing that the judgment of the lower court, entered pursuant to the verdict, and the order of the lower court denying appellant's motion for a new trial, should be sustained.

It is so ordered.

## ON PETITION FOR REHEARING

*Per Curiam:*

Rehearing denied.